MaddeN, Judge,
delivered the opinion of the court:
The plaintiff, a commissioned warrant officer in the United States Navy, was honorably discharged on March 31, 1956, without retired pay. He sues in the alternative for either
(1) active duty pay from a date in 1955 when a Physical Evaluation Board found that he was fit for active service, or
(2) retired pay from the date of his discharge, on the asserted ground that he had, at that time, a service-incurred disability of more than 30 percent.
The plaintiff first enlisted in the Navy in 1936. He served successive periods of enlistment, and attained the rank of commissioned warrant officer. In November 1951 he was admitted to the sick list and, a few days later, his illness was diagnosed as “Psychotic depressive reaction #3111.” He described to the doctors a recent nervous breakdown, spoke of pains in his chest, exhibited a feeling of guilt about accepting a commission as chief boatswain, was depressed, and wept *275 every few minutes. At first the plaintiff was kept in a closed ward, but he improved and was allowed to be in an open ward.
The medical staff was of the opinion that the plaintiff had had a depression of psychotic degree which had “entered partial remission”, that is, had improved, without treatment. The staff recommended that the plaintiff appear before a Physical Evaluation Board, which he did in February 1952. That Board, and on review, the Physical Review Council, found that the plaintiff was physically unfit to perform the duties of his rank by reason of psychotic depressive reaction; that his disability was service-incurred; that his disability was 50 percent according to the standard schedule of rating disabilities in current use by the Veterans Administration, Code Number 9099 “Psychotic Depressive Reaction, in partial remission with considerable impairment of social and industrial adaptability”; and that his disability might be of a permanent nature.
The Secretary of the Navy approved the proceedings and findings recited above, and directed that the plaintiff be placed upon the temporary disability retired list in conformity with the provisions of section 402(b) of the Career Compensation Act of 1949, 63 Stat. 802, 817, 37 U.S.C. (1952 ed.) § 272(b). The plaintiff was placed on the temporary disability retired list on March 1, 1952.
Thereafter the plaintiff was given periodic physical examinations. A clinical board report in February 1955 stated that the plaintiff had made excellent adjustment; that he had worked for two years as a salesman for Sears, Roebuck and Co. without difficulty; that he had been living with his wife and three children, and said that he had had no emotional difficulties; that he was anxious to return to active service in the Navy. The clinical board was of the opinion that the plaintiff had made a complete recovery from his psychotic depressive reaction and that he was fit for duty. On the basis of the report of the clinical board, the Physical Review Council recommended that the plaintiff appear before a Physical Evaluation Board. In May 1955 he appeared before such a board which heard evidence and de *276 cided that the plaintiff was fit to perform the duties of his rant.
This decision was reviewed by the Physical Eeview Council which recommended to the Secretary of the Navy that the plaintiff be found unfit for duty, by reason of service-incurred psychotic depressive reaction; that he be found to have zero percent of disability according to the Veterans Administration schedule of rating; and that he be discharged with severance pay. Section 402(b), referred to above, provides that a person having at least eight years of active service, discharged for service-incurred disability, but with a disability rating of less than 30 percent, shall not receive retired pay, but shall receive the severance pay provided in section 403 of the Act, 63 Stat. 820, 37 U.S.C. (1952 ed.) §273.
The Physical Disability Appeal Board in July 1955 reviewed the proceedings described above and approved the findings of the Physical Eeview Council that the plaintiff was unfit for active service, but disapproved the finding that his percentage of disability was zero. It recommended to the Secretary that the plaintiff be retained on the temporary disability retired list and that his situation be reevaluated at some time before the expiration of the five-year period from the time in 1952 when the plaintiff was placed on the temporary disability retired list. However, in January 1956, the Physical Disability Appeal Board reconvened and recommended to the Secretary that the entire report of the Physical Eeview Council, including the zero percentage of disability, be adopted. One of the five members of the Appeal Board dissented, saying that he would find the plaintiff’s percentage of disability to be at least 30 percent.
The Secretary, on February 24, 1956, followed the recommendation of the Physical Disability Appeal Board and removed the plaintiff from the temporary disability retired list and separated him from the Naval service, effective March 31,1956, without retired pay but with severance pay.
On March 6, 1957, the plaintiff filed an application with the Board for Correction of Naval Eecords. That Board held a hearing, and recommended that the plaintiff appear *277 before another Physical Evaluation Board. He did so, and that board expressed the opinion that the plaintiff was fit to perform the duties of his rank. The Correction Board on March 8, 1958, recommended that the Navy record of the plaintiff be changed to show:
a. That he was not discharged from U.S. Navy on 31 March 1956, with severance pay, and
b. That he was continued on the temporary disability retired list until 1 March 1957 on which date he was reappointed to the active list and recalled to active duty without loss of rank or precedence.
The Correction Board also recommended that the plaintiff be paid in accordance with the corrected record.
The Secretary of the Navy requested the comment of the Chief of the Bureau of Medicine and Surgery, who on April 22, 1958, submitted his comments. They are quoted in full in finding 18. He said that, with rare exceptions, members of the Naval service who have suffered from a severe mental illness — particularly an emotional disturbance of psychotic proportions — are considered unfit for further Naval service for reasons which are both medical and military. He explained in great detail the reason for this Navy policy. He said that even though there is an apparently complete recovery, there is a well warranted reluctance to impose trust, confidence and responsibility in such officers, and a corresponding difficulty on the part of the officer in obtaining ■the trust and confidence of subordinates. He cited the large number of Naval officers who between 1950 and 1956 had been discharged for physical unfitness due to psychosis, and the fact that a large proportion of them had less than 30 percent of disability. He said that, if the reasoning of the Correction Board had been followed, many of those persons would have been found fit for duty; that if they had been returned to duty, the effectiveness of the Naval service would have been compromised; and that returning some of them to duty and refusing to return others would have been discriminatory and inequitable.
The Secretary, in view of the comments of the Chief of the Bureau of Medicine and Surgery, requested the Board *278 for Correction of Naval Records to reconsider its decision. The Board supplied a copy of those comments to plaintiff’s counsel, who wrote a long letter to the Board, discussing the comments, and insisting that the plaintiff was fit for active duty and that, if he was not so fit, he had a percentage of disability which entitled him to retired pay.
The Correction Board reconsidered its previous action and advised the Secretary that “no change, correction or modification of petitioner’s Naval record is warranted.” The Secretary approved this decision on December 1,1958.
The plaintiff presented no medical evidence at the trial of this case in this court. The Government presented as a witness the head of the Neuro-psychiatric Branch of the Navy’s Bureau of Medicine and Surgery. His testimony supported the Navy’s conclusion that the plaintiff was unfit for active service, and that his percentage of disability, according to the Veterans Administration schedule of rating, was zero.
We consider first the plaintiff’s claim for active duty pay from the time that he was separated from the service. Recovery of such pay would require a conclusion on our part that the refusal of the Navy to restore him to active service was illegal and invalid, that he was in law, though not in fact, in active service, and should be paid accordingly. The Navy refused to restore the plaintiff to active service because of its general policy of not permitting an officer who had had a mental illness of psychotic proportions to be in active service. That policy is explained with great care in the comment of the Chief of the Bureau of Medicine and Surgery. We could not possibly say that the adoption and application of such a policy was arbitrary or illegal. The plaintiff complains of the generality of the policy in that it takes no account of the individual situation of the plaintiff and the extent of his recovery from his illness. This criticism is not sound. As the Chief of the Bureau said in his comments, the reasons why officers in the plaintiff’s situation are considered unfit for further Naval service “are both medical and military.” The medical and military reasons justify the adoption of the general policy. Unless we would be willing, if we had the power to do so, to order the Navy to restore the plaintiff to active duty, we should not require the Navy to *279 pay him as if he were on active duty. We therefore deny the plaintiff’s first alternative claim.
We now consider the plaintiff’s second alternative claim for retired pay. He urges that the conclusion that he is unfit for active duty by reason of physical disability and the accompanying conclusion that his percentage of disability is zero are mutually contradictory.
The pertinent provision of section 402(b) of the Career Compensation Act of 1949, section 272 (b) of Title 37 of the United States Code, provides retired pay for officers found unfit for active service by reason of service-incurred disability, but it also expressly provides that officers so found unfit, but having less than 30 percent of disability, shall not receive retired pay, but shall receive severance pay as provided in section 403. If, then, the plaintiff had been found to have had 25% of disability instead of zero percent, his situation with regard to retired pay would have been exactly what it is now. He would have received severance pay, which he has received, and would, like all other officers with less than 30 percent of disability, have received no retired pay. The rather shocking decision that his percentage of disability was zero turns out, upon analysis, to be less important, so far as the issues in this case are concerned, than it seemed tobe.
Before the percentage of disability was made a factor in computing retired pay, by the Career Compensation Act of 1949, it seems that if one was released from service because of disability, the degree of his disability had no bearing on the amount of his retired pay. However slight his disability might have been, if it was enough to unfit him for active service, he was entitled to retired pay, and in the same amount as if he had been completely disabled from any activity at all.
The Career Compensation Act in its section 402(d), 63 Stat. 818, 37 U.S.C. (1952 ed.) § 272(d), made the percentage of disability an important factor in computing the amount of retired pay, on retirement for disability, and in section 272(b), as we have seen, a decisive factor in determining whether there should be any retired pay at all, as distinguished from mere severance pay. In section 272(b), *280 Congress provided that the percentage of disability should be determined “in accordance with the standard schedule of rating disabilities in current use by the Veterans Administration.” That schedule is written without regard to one’s percentage of disability for military service. As to that, there are no percentages. One is either fit, or unfit. If he is unfit, the slight percentage of his unfitness will not keep him in the service. The Veterans Administration rating has to do with the extent, the percentage, of his disability to adjust himself to his surroundings and make a living outside the military service.
The plaintiff was unfit to be an officer in the Navy, because of the Navy’s rule with regard to persons who had once had a psychotic illness. Such an illness, the last attack of which was several years past, leaving no visible maiming or palpable crippling, might have little or no handicapping effect upon one’s ability to live and earn a living outside the military services. The Veterans Administration schedule rates a manic depressive psychosis, in complete remission, following a psychotic period which required hospitalization of six months or less, as having a percentage rating of zero when a year has elapsed since the hospitalization. In the plaintiff’s case several years had elapsed.
The Navy did what Congress, in section 402(b), required it to do. If we had the temerity to substitute our judgment for that of the constituted authorities, we would have to amend the zero rating to at least 30 percent in order to make the plaintiff eligible for retired pay.
The plaintiff’s situation is that he has, in addition to his severance pay, an official determination that he had a service-incurred psychotic illness, which is now in complete remission. If it, in the future, becomes actually disabling, he will be entitled to payments from the Veterans Administration, based upon its schedule of percentages of disability, which can be any percentage up to 100.
The plaintiff’s petition will be dismissed.
It is so ordered.
Durfee, Judge; Laeamoee, Judge; Whitaker, Judge; and JoNes, OMef Judge, concur.
*281 FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is a citizen of the United States and is a resident of the Commonwealth of Virginia.
2. The plaintiff first enlisted in the United States Navy on February 12, 1936, and served through successive terms of enlistment, ultimately attaining the rank or grade of commissioned warrant officer. On March 31, 1956, plaintiff was honorably discharged from the Naval Service with severance pay by reason of physical disability.
3. A clinical board report, dated February 5, 1952, indicated that plaintiff was admitted to the sick list on November 13,1951, with diagnosis “anxiety reaction # 3100”. On November 19,1951, the diagnosis was changed to “Psychotic depressive reaction # 3111”. He described a recent nervous breakdown, spoke of pains in his chest, exhibited guilt feeling about accepting a chief boatswain commission, was depressed and wept every five minutes. At first he was kept in a closed ward but as he progressed was allowed in an open ward. It was the opinion of the staff that the plaintiff had had a depression of psychotic degree which had entered partial remission without treatment. It was recommended that he appear before a Physical Evaluation Board.
4. On February 11, 1952, the plaintiff appeared with counsel before a Physical Evaluation Board at the United States Naval Hospital, Philadelphia, Pennsylvania, which board after hearing evidence decided to make the following recommended findings:
(1) He was unfit to perform the duties of his rank by reason of physical disability incurred while entitled to receive basic pay by reason of:
(2) Diagnosis. Psychotic Depressive Reaction, Basic Diagnostic Nomenclature Code Number 3011; that
(3) His disability was not due to intentional misconduct or willful neglect and was not incurred during a period of unauthorized absence; that
(4) He had completed at least eight years of active service; that
*282 (5) His disability was considered to be 50 percentum in accordance with the standard schedule of rating disabilities in current use by the Veterans Administration, Code Number 9099; Psychotic Depressive Reaction, in partial remission with considerable impairment of social and industrial adaptability; that
(6) Accepted medical principles indicated that his disability might be of a permanent nature.
5. On February 18, 1952, the findings and recommendation of the said Physical Evaluation Board were concurred in by the Physical Review Council. On February 20,1952, the proceedings and the recommended findings of the Physical Evaluation Board and the concurring action of the Physical Review Council were declared to be legal by the Judge Advocate General of the Navy, who forwarded the proceedings to the Secretary of the Navy. On February 21, 1952, the Secretary of the Navy approved the proceedings and recommended findings as concurred in by the Physical Review Council and directed that the plaintiff be placed upon the temporary disability retired list in conformity with the provisions of 87 U.S.C. 272(b). The plaintiff was placed on the temporary disability retired list on March 1, 1952.
6. Plaintiff was given periodic physical examinations. A clinical board report dated February 24, 1955, stated that plaintiff had made excellent adjustment, that he had worked for two years as salesman at Sears Roebuck and had no difficulty. He had been living with his wife and three children and denied any emotional difficulties. He was anxious to be returned to active duty in the Navy. The board was of the opinion that he had made a complete recovery from his psychotic depressive reaction and was fit for duty. On the basis of this report, the Physical Review Council recommended that petitioner appear before a Physical Evaluation Board.
7. On May 26, 1955, plaintiff again appeared before a Physical Evaluation Board at the United States Naval PIos-pital, Portsmouth, Virginia, which board after hearing the evidence determined that the plaintiff was fit to perform the duties of his rank.
*283 8. The record of proceedings was forwarded to the Physical Review Council in the Navy Department, which Council on June 14,1955, took the position, and recommended to the Secretary of the Navy, that plaintiff was unfit for duty by reason of Psychotic Depressive Reaction No. 3111 incurred while in receipt of basic pay; that his disability was not due to intentional misconduct or willful neglect and was not incurred during a period of unauthorized absence but that his disability was zero percent under Veterans Administration Code 9005 and might be of a permanent nature. It further recommended that he be discharged with severance pay. This action, it stated, was recommended “because the evidence of record indicates that you at this time are not physically qualified to perform the duties of your rank.” It does not appear that the Physical Review Council had any evidence before it which was not also before the second Physical Evaluation Board.
9. The plaintiff was given five days to file a statement in rebuttal to the opinion and recommendation of the Physical Review Council and the Review Council, after considering his statement in rebuttal, on June 30, 1955, forwarded the proceedings to the Physical Disability Appeal Board stating that it adhered to its original opinion and recommendation.
10. The Physical Disability Appeal Board, on July 20, 1955, met for consideration of the plaintiff’s case and, after deciding that it was not necessary for him to be present, it reviewed the record of proceedings of the Physical Evaluation Board and the action of the Physical Review Council, together with all documents submitted to it in the case, including plaintiff’s statement in rebuttal to the substitute findings proposed by the Physical Review Council to the recommended finding of the Physical Evaluation Board, and reached the following conclusions:
The Physical Disability Appeal Board agrees with the Physical Review Council in its nonconcurrence in the recommended finding of the Physical Evaluation Board that the plaintiff be found fit to perform the duties of his rank, and with its proposed substitute finding that the plaintiff be found unfit to perform the duties of his rank by reason of physical disability, and *284 with the remainder of the Council’s proposed findings, with the exception of the percentage of disability (0%) proposed.
The Appeal Board is of the opinion that the plaintiff’s condition is not stabilized and therefore should not be finally evaluated at this time.
The Physical Disability Appeal Board therefore recommended to the Secretary of the Navy that the plaintiff be retained on the temporary disability retired list and reevaluated at a later date prior to the expiration of the five-year period provided by law in which a member of the Armed Forces may be retained on the temporary disability retired list.
11. The record of proceedings of the Physical Disability Appeal Board were forwarded to the Judge Advocate General of the Navy who, on October 11, 1955, advised the president of the said board as follows:
1. In reviewing subject record, it is noted that the Physical Disability Appeal Board has made recommended findings which, if approved, would affect the ultimate disposition of the case, but that the record does not indicate that the member was advised of the recommended findings of the Physical Disability Appeal Board with a brief statement of the reasons therefor.
2. As the law requires that a member on the Temporary Disability Betired List whose disability becomes less than 80 per cent be removed from the list and be separated from the naval service, it would appear that the Board should state that the member’s disability is presently ratable at 30 per cent or more under the VÁ Code Number assigned, if it feels he is so disabled. Since this case must be submitted to the Secretary of the Navy for final disposition, it would also be helpful to this office in preparing the case for the Secretary’s action if the considerations upon which the Board’s recommendations are based were set forth in the record.
3. In view of the foregoing, enclosure (1) is returned for such further action or comment as may be deemed appropriate.
By direction of the Secretary of the Navy.
It. Libby,

Assistant Judge Advocate General.

12. Meanwhile, the Physical Review Council, on September 8, 1955, informed the Secretary of the Navy that it did not concur with the findings of the Physical Disability Ap *285 peal Board but adhered to its original recommendation in the plaintiff’s case.
13. After receiving the opinion of the Judge Advocate General, the Physical Disability Appeal Board reconvened on January 5, 1956, and after consideration of the evidence before it, a four-member majority of the board decided to change their opinion as stated in the report of the board dated July 20, 1955, and submitted the following advisory opinion to the Secretary of the Navy:
That the proposed substitute findings of the Physical Review Council to the recommended finding of the Physical Evaluation Board, as stated in the Council’s Speedletter to the party concerned, dated 14 June 1955, should be approved.
A minority report was filed by a member of the said board, which report read as follows:
The Physical Disability Appeal Board on 20 July 1955 found the party not fit to perform the duties of his rank and disabled to a degree greater than 30% as rated under the Veterans Administration Codes 9099-9005. The Physical Disability Appeal Board further stated that his condition had not stabilized and should therefore not be finally evaluated at that time. It is my opinion that the finite effect resulting from a psychotic depressive reaction is difficult to measure. Recovery is recognized as a slow process. Relapse is liable at any time. To come to a hard and fast determination, the result arrived at must be based on a continued period of accurate historical behavior record and not upon appearance on a one-day stand before a board. For these reasons, it is my contention that in justice to the party, he must be accepted as at least a 30% disability risk until such time as his condition has stabilized one way or another.
On 11 October 1955, the Judge Advocate General requested that the consideration on which the board’s recommendations were made be set forth in the record.
On 5 January 1956, the Physical Disability Appeal Board again met to consider the case and comply with the Judge Advocate General’s request cited above. While no additional evidence was offered, the Majority Members changed their opinions at this time. I cannot concur and therefore adhere to my original estimate of the case, as listed under the Physical Disability Appeal *286 Board proceedings of 20 July 1955, based upon the considerations listed in paragraph 1 above.
Paul B. Tuzo, Jr.,
Gaptain, U.S. Navy,

Member.

14. On February 24, 1956, the record of proceedings of the Physical Evaluation Board in plaintiff’s case, together with the action or recommendations of the Physical Review Council and the Physical Disability Appeal Board, were declared to be legal by the Judge Advocate General of the Navy and by direction of the Secretary of the Navy, the plaintiff was removed from the temporary disability retired list and separated from the Naval service by reason of physical disability in accordance with the provisions of 37 U.S.C. 272 and 273, effective on March 31,1956.
15. On March 6, 1957, plaintiff filed an application for the correction of his Naval record with the Board for Correction of Naval Records in which he sought to either be recalled to active duty or, if actually unfit for duty because of a disability incurred while in receipt of basic pay, to be restored to the retired list of the United States Navy.
16. On December 2, 1957, the Board for Correction of Naval Records held a hearing on plaintiff’s application which was attended by the plaintiff and his counsel. Following the said hearing, the board recommended that the plaintiff appear before another Physical Evaluation Board.
17. On February 6, 1958, the plaintiff appeared with his counsel before a Physical Evaluation Board at the United States Naval Hospital, Portsmouth, Virginia. The Correction Board had requested an opinion as to the condition of the plaintiff on March 1, 1957 (which date marked the expiration of the five-year period for the purpose of the temporary disability retired list) and also what his physical condition was at the present time. It was the opinion of the Physical Evaluation Board that the plaintiff was fit to perform the duties of his rank; however, it was stated that the Board “has no way of judging a man’s condition as of March 1, 1957, except from a review of the record and his present appearance. There is no evidence that he was not fit at that time.”
*287 A clinical record consultation report of January 21,1958, read in part as follows:
Psychiatric examination at this time reveals that this patient is very co-operative, alert and active. There is no evidence of any depressive feelings at this time. _ He is somewhat tense and apprehensive but it is believed this is due to his concern about returning to duty. Physiological tests revealed that the Rorschach is within normal limits. It showed some anxiety which he appears capable of handling, and does not disturb Ms ability to function adequately. A review of both the psychiatric and physiological tests revealed that the patient is in remission and at this time could be considered fit for duty.
The findings of the Physical Evaluation Board were forwarded to the Board for Correction of Naval Records, which board on March 18,1958, recommended to the Secretary that the Naval record of the plaintiff be changed wherever appropriate to show:
a. That he was not discharged from U.S. Navy on 31 March 1956, with severance pay, and
b. That he was continued on the temporary disability retired list until 1 March 1957 on which date. he was reappointed to the active list and recalled to active duty without loss of rank or precedence.
It further recommended that the Department of the Navy pay to the plaintiff all money, or moneys, lawfully found to be due as a result of the foregoing correction of record, less any amounts paid to him in the form of severance pay or other emoluments due to his separation from the service.
18. The decision and recommendation of the board were transmitted to the Secretary of the Navy, who sought comment from the Chief of the Bureau of Medicine and Surgery, who, under date of April 22, 1958, made the following comments upon plaintiff’s case:
1. By reference (a), this Bureau was requested to comment on enclosure (1).
2. From a review of enclosure (1) it would appear that the critical issue in the instant case is the petitioner’s physical fitness for duty. In tMs connection, the presence of a physical disability does not in itself render a member unfit, nor conversely, does the fact *288 that a member may not have significant symptoms of a Shysical disability at the moment mean that he is fit for uty. Physical fitness is determined not by the presence or absence of overt symptoms, but on the basis of whether the basic disease process impairs him in such a manner that he will be unable to perform the duties of his rank, so as to reasonably fulfill the purpose of Ms employment on the active list.
3.With rare exceptions, members of the naval service who have suffered from a severe mental illness, — particularly an emotional disturbance of psychotic proportions, — are considered unfit for further naval service for reasons wMch are both medical and military. An established diagnosis of a psychosis carries the implication that there has been a profound disruption in the individual’s emotional, thinking, and judgemental spheres. TMs disruption is insidious and subtle in its development and results in changes in behavior, thinking, and judgment which may vary from minor deviations to changes so bizarre that they are easily recogmzed by laymen. WMle modem psychiatric treatment procedures frequently result in marked remissions in symptomatology, naval experience has been that a return to the environment which caused the overt acute symptoms is likely to again precipitate recurrent illness, often in a more severe form and less tractable to treatment.
4.From the military point of view there is difficulty in assimilating officers in the naval service if there is an established liistory of an overt psychiatric break. Despite a complete remission there is a well warranted reluctance to impose trust, confidence, and responsibility in such officers; there is a corresponding difficulty on the part of the officer himself in obtaining the trust and confidence of subordinates. Errors in judgment, either rightly or wrongly, may be attributed to his mental illness and there is also always the possibility that important military operations or decisions may be compromised by disruption in thinking, judgment, or behavior caused by recurrent, but unrecognized emotional difficulties.
5.In view of the foregoing, this Bureau is of the opinion that even though the petitioner may now be in a complete remission, he is not fit for duty and should not be returned to the active list.
6.In support of the decision of the Board for Correction of Naval Records, the board has stated that “there appears to be a divergence of medical opinion *289 concerning Petitioner’s physical condition at the time he was discharged from the service on 31 March 1956; that this difference in professional reckoning is of significant proportion and should have served as a caveat against releasing Petitioner from service — ; that the various expressions of medical opinion in connection with that decision gives [sic] rise to further speculation as to whether Petitioner’s physical condition had stabilized — ; and it is now apparent that Petitioner should have been continued on the temporary disability retired list until the end of the five year period.” The records do not support the conclusion that there was any disagreement among medical personnel as to the petitioner’s physical condition. All were in agreement that he had suffered an emotional disturbance of psychotic proportions and that on 31 March 1956 he was essentially in complete remission. Such differences of opinion as were presented represent differences in philosophy as to whether a member of the naval service with such a history should be considered fit for duty or unfit for further service. Likewise, the board’s conclusion that the petitioner’s disability had not stabilized and that he should have been continued on the Temporary Disability Eetired List until the end of the 5-year period is not in accord with the facts. When he appeared before the Physical Evaluation Board on 26 May 1955 he was in complete remission; his present physical condition is unchanged and there is good reason to believe that his physical condition on 1 March 1957 was the same as it had been on 31 March 1956. His record, at the time he appeared before the Physical Evaluation Board on 6 February 1958, indicated that his illness had stabilized and his subsequent course — contrary to the views of the Boards for Correction of Naval Records — has borne out this conclusion.
7. Although this Bureau is most sympathetic with any member of the naval service who must be separated for physical disability after long years of service without retirement benefits, Mr. Watson’s discharge with severance pay is not an isolated or unusual occurrence. During the period 1950 through 1956 a total of 6,308 members of the naval service were separated from the active list with benefits by reason of physical unfitness due to a psychosis. Of this number, 1,601, or approximately 25%, have been discharged with severance pay-indicating that their disability was ratable with less than 30 per centum and that the individual concerned had less than 20 years of active service. Practically *290 all of those who have been -discharged with severance pay could, if the reasoning advanced by the Board for Correction of Naval Record were followed, have been found fit for duty. It is the opinion of this Bureau that the adoption of any policy whereby large numbers of members who have suffered from a psychosis are returned to or retained on the active list would materially compromise the effectiveness of which the naval service could perform its mission; that returning some, such members to duty but denying the same opportunity to all members similarly situated is discriminatory and creates, rather than corrects, inequities. This Bureau, therefore, is of the opinion that the petitioner’s claim is without medical merit and recommends that the decision of the Board for Correction of Naval Records be disapproved.
B. E.
Bradley,

Deputy and Assistant Ohief,

The Office of the Secretary, hi view of the comments of the Bureau of Medicine and Surgery, requested the board to reconsider its decision.
19. Before taking any further action on plaintiff’s case, the Board for Correction of Naval Records forwarded to plaintiff’s counsel a copy of the said comments of the Chief of the Bureau of Medicine & Surgery which had been given to the Secretary of the Navy, and informed him that he might, if he wished, make reply thereto. Accordingly, under date of October 23, 1958, plaintiff’s counsel sent the following letter to the Board for Correction of Naval Records:
GeNtlemeN : Reference is made to your letter of September 19th enclosing the comments from the Chief of the Bureau of Medicine & Surgery to the Secretary of the Navy in the case of Albert T. Watson and giving me an opportunity to make a statement in rebuttal to the comments of the Bureau. Before filing a rebuttal to this statement, I thought I should acquaint Mr. Watson with its contents and receive his comments on it. He has sent me a letter which contains his comments and I feel that his letter is a rather adequate rebuttal to the position of the Bureau. Accordingly, I enclose the original letter, as well as a typed copy of it, for the Board’s consideration.
So far as I, myself, am concerned, I am not impressed with the position of the Bureau. First, I wish to em- *291 pbasize the fact that after the first board recommended that Mr. Watson be placed on the temporary disability retired list, each subsequent board before which he has appeared personally has found that he has regained his mental health and is fit for duty. The Bureau’s position apparently is that a person who has suffered from any sort of mental ailment cannot ever thereafter be considered as competent to perform the duties of an officer or warrant officer of the Navy. The Bureau cites no recognized medical authority in support of its position and, frankly, I don’t think there is any. Certainly the modem theory of mental ailments and treatment is that many persons suffering from mental ailments do respond to treatment and can be restored to society and perform valuable and responsible work in society. Certainly, we all know of instances where persons have suffered from mental ailments of one kind or another and have definitely been cured and are, today, performing valuable services in society. Many of these ailments assumed psychotic proportions. A well-publicized case that is in point is the case of Jim Piersall, the outfielder of the Boston Bed Sox.
In Paragraphs 3 and 4 of his letter to the Secretary of the Navy, the Chief of the Bureau says:
8. With rare exceptions, members of the naval service who have suffered from a severe mental illness — particularly an emotional disturbance of psychotic proportions — are considered unfit for further naval service for reasons which are both medical and military. An established diagnosis of a psychosis carries the implication that there has been a profound disruption in the individual’s emotional, thinking, and judgemental spheres. This disruption is insidious and subtle in its development and results in changes in behavior, thinking, and judgment which may vary from minor deviations to changes so bizarre that they are easily recognized by laymen. While modern psychiatric treatment procedures frequently result in marked remissions in symptomatology, naval experience has been that a return to the environment which caused the overt acute symptoms is likely to again precipitate recurrent illness, often in a more severe form and less tractable to treatment.
4. From the military point of view there is difficulty in assimilating officers in the naval service if there is an established history of an overt psychiatric break. Despite a complete remission there is a well warranted reluctance to impose trust, confidence, and responsibility *292 in such officers; there is a corresponding difficulty on the part of the officer himself in obtaining the trust and confidence of subordinates. Errors in judgment, either rightly or wrongly, may be attributed to his mental illness and there is also always the possibility that important military operations or decisions may be compromised by disruption in thinking, judgment, or behavior caused by recurrent, but unrecognized, emotional difficulties.
While I do not concede that this is a sound position from a medical point of view for the Bureau to adopt, nor that the policy is a reasonable one, I do think that if such a position is adopted and sucn a policy is followed, the Bureau should, in fairness to an individual, recognize the fact that a person so affected by its position and its policy is entitled to retirement. The basic and fundamental conception of a disability is that it incapacitates for the performance of duty and lessens one’s availability or qualifications for other em/ployment. That is the fundamental and only reasonable basis for giving retirement benefits on account of physical disability. That is to say, one’s opportunity for obtaining and holding employment have been lessened by reason of his disability. The Chief of the Bureau, while he takes the position that Mr. Watson has no percentage of disability for retirement purposes, nevertheless, at the same time determines he is unfit for employment in the Navy. It would seem to follow that if tliis position is sound, he is likewise unfit for any employment which would require one to impose “trust, confidence or responsibility” in the employee or which would involve “thinking,” or “judgment” on the part of the employee.
Where one is unfit to hold employment involving such factors, it would seem that his employment opportunities are very severely limited and certainly some reasonable percentage of disability should be recognized.
In closing, I may also point out that Mr. Watson when he appeared before the Physical Evaluation Board, called the Board’s attention to the fact that portions of his medical record were definitely in error and that some of the facts set forth as having occurred had not actually occurred. One of the facts which he mentioned, and upon which the medical officers had made their original diagnosis to the effect that he was suffering from a mental illness which had reached psychotic proportions on occasion, was that he had become very emotionally upset ‘because of his feeling of responsibility *293 for the death of a man aboard his ship who had been killed in an accident for which Mr. Watson felt he had been largely responsible. Mr. Watson pointed out to the Board that the recital of these facts by the medical officers in support of their diagnosis was based upon, and on, imagination or distortion of the facts for no man had been killed in such an accident; that he had never considered himself responsible for the accident in the first place. This and other errors, I am sure, had been pointed out to the Bureau of Medicine & Surgery on several occasions but I have never seen any indication on the part of the Bureau that it recognizes the fact that its medical officers conceivably could have made an erroneous diagnosis of Mr. Watson’s mental condition in the first instance, based upon erroneous facts developed by those medical officers. The case of Morris Brown v. United States, C. Cls. No. 50362, decided October 8, 1958, is a case which well illustrates the dangers inherent to a diagnosis based upon supposed facts which do not, in fact, exist and never did exist. While a matter of degree, it is obvious that some of the facts upon which the medical officers relied in making the original diagnosis of mental incapacity on the part of Mr. Watson simply did not exist.
In concluding, I can only say that every Board of Officers which has seen or considered Mr. Watson’s case since the first retiring Physical Evaluation Board, has determined that he is fit for duty. The Bureau, basing its conclusions and opinion solely upon records which are erroneous, at least hi part, continues to adhere to its position that he is not fit for duty, but at the same time, takes the position he is not suffering from any percentage of disability for retirement purposes. As I see it, it is one or the other — he is fit for duty and should be restored to duty or, if not fit for duty, he does suffer from a retirable percentage of disability. It seems to me that one or the other condition must necessarily exist.
I trust that the Board will consider these remarks in connection with its review of Mr. Watson’s case.
Very truly yours,
Fred W. Shields.
FWS :bjc.
enc.
20. No further hearing was had in the case by the Board for Correction of Naval Eecords but under date of November 7,1958, the Secretary of the Navy was advised that “it is *294 the decision of this board that no change, correction or modification of petitioner’s naval record is warranted.” On December 1, 1958, the said decision was approved by the Secretary of the Navy.
21. The plaintiff, through his counsel, was notified of the final action of the board on December 3,1958.
22. Plaintiff presented no medical or other witnesses to testify in this case. The defendant called as a witness, Dr. John E. Nardini, a specialist in the field of psychiatry and assigned as head of the Neuropsychiatric Branch in the Navy’s Bureau of Medicine and Surgery. Dr. Nardini has been on continuous active duty in the Navy with the Medical Corps since 1938 and has been active in the field of psychiatry since 1946. This witness agreed that the medical records showed that symptoms of plaintiff were in complete remission by March 31, 1956, and perhaps as early as May of 1955. He further agreed that the disability rating of 0 percent was proper. The witness had not examined the plaintiff personally. Findings 23 through 28 are based on Dr. Nardini’s testimony.
23. Mental and emotional disorders occupy something of a unique status in the field of medicine, particularly in relation to duty in the military service which is also a unique situation. It is important that an individual who is placed in a position of responsibility be at all times, fully able and capable of performing his duties to the highest level of effectiveness and reliability. The Navy has had a number of very difficult experiences in which mental disorders have occurred in Naval personnel, including officer personnel. As a result, the Medical Corps has urged great caution in subsequent reassignment of such personnel who have had occasions of serious mental and emotional 'breaks. It has further been the experience of the Navy that it is unwise to return men to the same kind of military situation or military duties after they have had a serious emotional break.
24. The initial stages of a mental and emotional disorder, as well as its recurrence, are generally somewhat insidious in nature; unless attended or examined by a specialist in the field, it is usually difficult to establish or prove as a mental *295 disorder. The factor that renders the plaintiff unfit is the potentiality of further difficulties, in the same environment and situations, rather than the presence or lack of presence of the primary symptoms which he once had at the time he was more acutely ill.
25. In a depressive reaction there are certain things that are evident. The individual feels bad, in general; his mental processes are generally slowed down; he has very low physical prowess; his thinking is often disordered or distorted or inappropriate, because of the emotional feelings that attend the depression. These include feelings of unworthiness, worthlessness, uselessness, futility, and a general reduction in mental effectiveness, sharpness of opinion, clarity of thinking, etc. Memory is somewhat slowed in the same process, and judgment is affected in a similar way, because of the slowing down processes and the distortions that are related to the emotional values. Most individuals go into this rather gradually and reach a certain peak, and at the peak level are unable to function in their ordinary work-a-day situations. These may last anywhere from weeks to months, even years; and they may go into remission or may reoccur at any time or may never reoccur. There is no way of being absolutely certain as to what the eventual course may be. The psychotic phase of the depressive reaction refers essentially to the matter of degree and depth of the depression and to some extent to the degree of mental involvement, the degree of retardation, and the degree of effectiveness in thinking and reacting. The term psychotic refers to the most serious phase of the disease.
26. The Navy is in a somewhat unique situation in which the lives of many people are, at times, dependent upon the actions of one single individual. Kecurrent difficulties of an emotional and mental nature are not always easily detectable and, therefore, the general policy in the Navy has been not to take unnecessary chances in this type of situation. This policy is also based partly on the fact that any individual may develop any mental illness at any time, but an individual who has already had one episode of mental difficulty is more likely than the average individual to have a *296 recurrence. Therefore, generally, the Navy’s policy has been one of caution in this situation.
27. The mental or emotional illness is further to be distinguished from other types of physical disability. In the latter case, such as a man who has had an attack of arthritis which is attended by pain and soreness and tenderness and swelling of joints, he will seek medical assistance at once and the situation is easily detectable. On the other hand, with emotional difficulties the situation is much more complex since the patient may be unaware of what is happening to him and it may not be readily observable to others, including the medical profession. He is not as likely to seek immediate medical help and the situation is likely to develop into a serious one without warning.
28. In addition, there is the consideration of the individual involved. Generally speaking, when a person has an emotional breakdown in certain surroundings, if there is a return to the same situation and surroundings, unless there has been a great deal of treatment to correct it, the .tendency or probability of recurrence is greater than if the individual is placed in a different type of environment.
29. Code 9005 of the Veterans Administration Schedule for Rating Disabilities provides as follows:
9005 Manic depressive psychosis: Bating
Requiring institutional care, or definitely deteriorated, or with increased or decreased psycho-motor activity, or other symptomatology or sufficient severity to produce complete social and industrial incapacity- 100
[In partial remission, following total incapacity as above, with lesser symptomatology such as to produce severe impairment of social and industrial adaptability_ 70

Effective August 23,1948-1

In partial remission, following total incapacity as above, with lesser symptomatology such as to produce:
(a) Considerable impairment of social and industrial adaptability_ 50
(b) Definite impairment of social and industrial adaptability_ 30
(c) Slight impairment of social and industrial adaptability_ 10
*297 9005 Manic depressive psychosis — Continued Bating In complete remission:
Following a psychotic period which required hospitalization for 1 year or more, following the convalescent rating:
For the first year_ 50
Thereafter_ 10
Following a psychotic period which required hospitalization for 6 months to 1 year, following the convalescent rating:
For the first year_ 30
Thereafter_ 10
Following a psychotic period which required hospitalization from 3 to 6 months:
For the first year_ 10
Thereafter_ 0
Following a psychotic period which did not require hospitalization of at least three months_ 0
Note (1) Convalescent ratings in psychoses. Upon discharge or trial visit from a hospital where a beneficiary has been under care and treatment for a period of not less than 6 months, a rating of 100 percent will be continued for a period of 3 months, after which the condition will be rated in accordance with the degree of disablement shown and in conformity with the schedule provided.
(2) In determining the degree of disability from the psychoses the rating agency should consider, in addition to the symptomatology, the record as to frequency, duration and severity of previous psychotic episodes over a term of years, so as to represent the average level of social and industrial inadaptability.
39. The Veterans Administration Schedule for Eating Disabilities, 1945 edition, in effect at the time here concerned, under the topic “Psychiatric Conditions”, contained the following:
5. Social and Industrial Inadaptability. — The degree of disability from the psychoses and psychoneuroses should be determined, in general, by the extent of social and industrial inadaptability, i.e., the extent to which the symptomatology would permit the patient to adjust himself to his social and industrial environment. Social and industrial inadaptability, the criterion for rating disability from the psychoses, psychoneuroses, etc., contemplates those abnormalities of conduct, judgment, and emotional reactions which affect economic adjustment, i.e., which produce impairment of earning capacity.
*298 31. Tbe evidence in tbis case fails to demonstrate any degree of impairment of plaintiff’s economic adjustment or earning capacity by reason of abnormalities of conduct, judgment or emotional reactions, as a result of psychosis.
CONCLUSION OF LAW
Upon tbe foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and his petition is therefore dismissed.